**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHRISTOPHER LUEVANO, | Civil No.   09cv0145-WQH (RBB) |
| Petitioner, | |
| | **REPORT AND RECOMMENDATION RE: DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS  [Doc. No. 1]** |
| vs. | |
| M. MARTEL, Warden, et al., | |
| Respondents. | |

I.    __INTRODUCTION__

Christopher Leuvano (hereinafter "Luevano" or "Petitioner"), is a state prisoner proceeding pro se with a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 [doc. no. 1].  Leuvano challenges his San Diego County Superior Court convictions for aggravated mayhem, assault with a deadly weapon, and petty theft with a prior.  (Pet. 6-8; Pet. App. A, 1-9; see also Lodgment No. 1, Clerk's Tr. 00007-11, Oct. 19, 2006 (amended information); id. at 00161-65, Nov. 22, 2006 (verdicts).)  Petitioner contends that his federal constitutional rights under the Sixth and Fourteenth

Amendments were violated because the trial court denied a motion to reopen the defense case in order to cross-examine the main prosecution witness with recently obtained documents, and he received ineffective assistance of trial and appellate counsel in connection with that issue.  (See Pet. 6-8; Pet. App. A, 1-9.)

Respondent Warden Martel (hereinafter "Respondent") counters that habeas relief is not available because the resolution of Petitioner's claims by the state courts was neither contrary to, nor an unreasonable application of, clearly established federal law.  (See Mem. P. & A. Supp. Answer 3-10.)

Based upon a review of the pleadings, documents, and evidence presented in this case, and for the reasons set forth below, the Court recommends the Petition be **DENIED**.

## II.  PROCEDURAL BACKGROUND

On October 19, 2006, an amended information was filed in the San Diego County Superior Court charging Luevano with one count of mayhem in violation of California Penal Code ("Penal Code") section 203 (count one), one count of assault with a deadly weapon by means of force likely to cause great bodily injury in violation of Penal Code section 245(a)(1) (count two), and one count of petty theft with a prior in violation of Penal Code section 484 (count three). (Lodgment No. 1, Clerk's Tr. 00007-11.)  The charging document alleged that Luevano had three prior convictions for which he had served time in prison and had not remained free of custody for five years following his release, within the meaning of Penal Code sections 667.5(b) and 668, and he had two prior "strike" convictions within the meaning of Penal Code sections 667(b)-(i), 1170.12, and 668, California's three-strikes law.  (Id.)

Following a jury trial, Luevano was convicted on all counts. (Lodgment No. 1, Clerk's Tr. 00161-65 (verdicts).)  The jury also found that he personally used a deadly weapon and inflicted great bodily injury on the victim during the commission of the offenses. (Id.)  Luevano admitted the prior conviction allegations were true, and he was sentenced to a state prison term of twenty-five years to life plus ten years.  (Id. at 00167 (mins.); Lodgment No. 2, Rep.'s Tr. vol. 4, 508-18, Nov. 22, 2006.)

Petitioner filed an appeal in the California Court of Appeal for the Fourth Appellate District, Division One, in which he raised, as his sole ground for relief, claim two presented here. (Lodgment No. 3, Appellant's Opening Brief, People v. Luevano, No. D050281 (Cal. Ct. App. Feb. 15, 2008).)  The state appellate court affirmed the convictions in all respects in an unpublished opinion. (Lodgment No. 4, People v. Luevano, No. D50281, slip op. (Cal. Ct. App. Feb. 15, 2008).)

Next, he filed a petition for review in the California Supreme Court in which he presented, as his sole ground for relief, claim two raised here.  (Lodgment No. 5, Pet. for Review, People v. Luevano, No. SD2007800791 (Cal. filed Feb. 26, 2008).)  The court denied the petition without a citation of authority or a statement of reasoning.  (Lodgment No. 6, People v. Luevano, No. S161233, order (Cal. Apr. 28, 2008).)

Luevano thereafter filed a habeas corpus petition directly in the California Supreme Court, without filing habeas petitions in the lower state courts, in which he asserted all three claims presented here.  (Lodgment No. 7, Luevano v. Martel, No. S165083 (Cal. filed July 14, 2008) (petition).)  The court denied the

petition without a citation of authority or a statement of reasoning.  (Lodgment No. 8, In re Luevano, No. S165083, order (Cal. Dec. 17, 2008).)

Luevano filed a habeas corpus Petition pursuant to 28 U.S.C. § 2254 in this Court on January 23, 2009 [doc. no. 1].  Respondent filed an Answer and a Memorandum of Points and Authorities in Support of the Answer to the Petition on June 1, 2009 [doc. no. 10], and Petitioner filed a Traverse on July 6, 2009 [doc. no. 16].

**III.     TRIAL PROCEEDINGS**

In June of 2006, Cynthia Moreno was employed as a customer service manager at the College Grove Wal-Mart store in San Diego. (Lodgment No. 2, Rep.'s Tr. vol. 2, 41, Nov. 20, 2006.)  Adrian Salas was employed as a loss prevention officer at the same store. (Id. at 99.)  On the evening of June 5, 2006, Moreno was assisting the cashier at the self-checkout registers near the store's exit. (Id. at 49.)  From that location, she could see the price and description of each item scanned.  (Id.)  About the same time, in a different part of the store, Salas observed Luevano place a Universal Product Code ("UPC") bar code label on a box containing a computer monitor and proceed toward the self-checkout line.  (Id. at 107-14.)  Salas described Luevano to Moreno and instructed her to "verify what he's scanning." (Id. at 50-51.)  The shirts Luevano scanned rang up as shoes, and the computer monitor, priced at $298, scanned as a mouse pad costing $2.97.  (Id. at 54-55, 60.) The merchandise Petitioner scanned had a total retail selling price of $320.21, but he was only charged $21.64.  (Id. at 74.)

///

///

While Luevano was still in the process of checking out, Moreno told Salas what she had observed. (Id. at 61.)  Moreno then watched Luevano proceed toward the exit followed by Salas. (Id. at 62-65.)  She knew that when confronting shoplifters, it was Salas's practice to "grab" them, inform them that he is security for the store, and ask them to come back inside and answer a few questions. (Id. at 65.)  That process is usually quick; Moreno became concerned when Salas had not returned with Petitioner after two minutes. (Id. at 65-66.)  She approached the exit and saw Salas pulling on Luevano's arm. (Id. at 66.)  Petitioner freed himself from Salas's grip and ran toward a half-door where shopping carts are brought into the store. (Id. at 67.)  Moreno testified that Salas attempted to push Luevano into a soft drink vending machine, but Luevano was able to duck underneath the cart door and run outside. (Id. at 68.)  Moreno went outside and saw Salas and Petitioner wrestling on the ground; Salas was attempting to handcuff Luevano, but Luevano was fighting and resisting being handcuffed. (Id. at 69.)  Moreno went back inside the store and called the manager. (Id. at 70.)

Salas testified that he had been trained, consistent with Wal-Mart policies, to use reasonable force when handcuffing suspected shoplifters, which included taking them to the ground and using "pressure points," but not directly striking the suspect. (Lodgment No. 2, Rep.'s Tr. vol. 3, 130-31, Nov. 21, 2006.)  He said he was never given any training, either by Wal-Mart or a third-party provider, regarding how he should chase a fleeing suspect, and the training he received was based on the assumption that the suspect is not trying to flee. (Id. at 180-82.)  Salas

09cv0145

stated that it is his normal procedure in an encounter with a suspected shoplifter to first identify himself, and then ask the suspect to come back inside the store and discuss the stolen merchandise. (_Id._ at 136-40; Lodgment No. 2, Rep.'s Tr. vol. 2, 103.)  If the individual runs back inside the store, the policy provides that Salas can handcuff him but not take him to the ground. (Lodgment No. 2, Rep.'s Tr. vol. 3, 131.)

Salas testified that after he observed Luevano place a UPC bar code on a computer monitor, he described Luevano to Moreno and asked Moreno to let him know the price it scanned. (Lodgment No. 2, Rep.'s Tr. vol. 2, 108, 114; Lodgment No. 2, Rep.'s Tr. vol. 3, 132-33.)  Salas watched Luevano as he scanned the items, and Moreno told Salas that the computer monitor scanned as a $3.00 mouse pad. (Lodgment No. 2, Rep.'s Tr. vol. 3, 136-40.)  Petitioner was speaking to another man while scanning the merchandise, and the two men proceeded together toward the exit. (_Id._ at 140-41.)  The man walking with Luevano exited first and set off the alarm. (_Id._) While that person was being checked by the "door leader," Luevano exited, also setting off the alarm. (_Id._)

Salas maneuvered in front of Luevano in order to confront him, because store policy provided that suspects were not to be approached from behind. (_Id._ at 142-44.)  Salas made eye contact with Luevano and said, "Sir, I'm from Wal-Mart security," and Petitioner nodded in understanding. (_Id._ at 145-46.)  Salas was in the middle of saying, "You need to come," when Luevano started to run. (_Id._ at 145.)

Salas grabbed Luevano's shirt, and they moved together toward the cart door. (_Id._ at 147-48.)  Salas pushed Luevano in an

attempt to get him up against the wall to handcuff him, as he had been trained to do.  (Id. at 149-50.)  Luevano pushed back, and his hand hit Salas in the head, as they both crashed into a soda machine.  (Id. at 150-51.)  Salas lost his hold on Luevano at that point, and Luevano went out the cart door.  (Id. at 152.)  Salas followed him through the cart door and succeeded in taking him down to the ground about four feet in front of the cart door.  (Id. at 152.)

Luevano managed to get away again, but Salas caught him where the sidewalk meets the blacktop of the parking lot, "not that far from the cart door."  (Id. at 153-54, 227.)  Salas pulled Luevano to the ground, took control of his wrist, took out his handcuffs, and attempted to handcuff him.  (Id. at 154-55.)  Luevano, who was face down with one hand under his body, resisted Salas's efforts to handcuff him by pulling away, but Salas managed to get the handcuffs on one wrist.  (Id. at 155-56.)  Salas told Petitioner to stop resisting and to put his hands behind his back to be handcuffed.  (Id. at 155.)

Luis Rodriguez, a Wal-Mart cashier, appeared and helped Salas get Petitioner's other arm around his back; Rodriguez held Luevano's legs as Salas finished handcuffing him.  (Id. at 156, 211.)  A uniformed security guard appeared just before Petitioner was handcuffed but did not help; Salas explained that the guard reports incidents that happen in the parking lot.  (Id. at 161-62.)

Although Salas never felt or saw a weapon, he felt blood gushing from the top of his head as he was trying to handcuff Petitioner.  (Id. at 157-58.)  Rodriguez testified that he saw something in Luevano's free hand that looked like a ball-point pen.

09cv0145

(Id. at 210-11.)  Rodriguez felt blood splatter "all over the place" and "figured [Luevano] managed to use the object in his hand."  (Id. at 213.)  Soon thereafter, Rodriguez saw an X-Acto utility knife lying on the ground just out of Petitioner's reach. (Id. at 215-17.)

Moreno testified that after calling the store manager, she went back outside and saw Rodriguez helping Salas subdue Petitioner.  (Lodgment No. 2, Rep.'s Tr. vol. 2, 70-71.)  She saw a uniformed security guard arrive and just stand by without intervening; the guard worked for the shopping mall, not Wal-Mart. (Id. at 82, 87.)  Moreno went back inside the Wal-Mart store and called an assistant manager.  (Id. at 71.)  When she came back outside a third time, Petitioner was in handcuffs standing beside Salas and still struggling to get away.  (Id. at 72, 83.)  Moreno observed Salas bleeding, and "his whole cheek was hanging" from his face, so she called the police.  (Id. at 71-73, 83.)  She did not see Salas or Luevano hit each other during their struggle.  (Id. at 71.)  Luevano struggled even after being handcuffed, attempted to run again, and told Salas "he was doing 25 to life."  (Id. at 72; Lodgment No. 2, Rep.'s Tr. vol. 3, 164-67.)

Salas was taken to the hospital immediately after the encounter; fifteen staples were used to close cuts to his head; eight staples went into his stomach; and a plastic surgeon sutured cuts to his face, nose, neck, and lip.  (Lodgment No. 2, Rep.'s Tr. vol. 3, 172-75.)  At the time of trial, Salas had visible scars on his neck, mouth, nose, head, and stomach as a result of the altercation with Petitioner.  (Id. at 175-77.)  The police officer who took a statement from Salas at the hospital testified that

09cv0145

blood was pouring from a very deep cut on his head, and Salas's injuries were "some of the worst" the officer had seen in his career.  (Lodgment No. 2, Rep.'s Tr. vol. 2, at 93.)  The police officer who arrested Petitioner testified that Luevano's injuries were minor and included a small cut above the eyebrow, a small laceration on his biceps, and tiny abrasions on his hand, injuries which merely required Band-Aids.  (Lodgment No. 2, Rep.'s Tr. vol. 3, 234-35, 239.)  The People rested their case-in-chief.  (Id. at 243.)

The only witness called by the defense was Petitioner.  He testified that he entered Wal-Mart with the intention of stealing merchandise by switching UPC bar codes, and he had an X-Acto knife and glue stick with him for that purpose.  (Id. at 244-45.)  Petitioner admitted that he had been convicted of residential burglaries in 1996 and 1997, and petty theft with a prior in 2000.  (Id. at 244.)

Luevano said he switched UPC bar codes on several items and checked out through the self-checkout lane.  (Id. at 244-46.)  As he was leaving the store, an employee asked to see his receipt, checked it, and handed it back.  (Id. at 248.)  Luevano continued toward the exit, when Salas approached him and identified himself as store security.  (Id. at 249, 289-90.)  Petitioner admitted he nodded to Salas in recognition that he had been caught, and then he "made a break for it and tried to run."  (Id.)  Luevano explained that he did not want to be caught because he had previously been convicted of petty theft with a prior, and if caught again, "more than likely," he "would be doing 25 to life."  (Id.)

///

Petitioner testified that as he tried to run, Salas grabbed him and pushed him into a soda machine. (Id. at 250.) Luevano hit the vending machine and pushed off toward a small door used for shopping carts. (Id.) Salas was holding Luevano's shirt, and he was "half dragging" Salas as they both went through the small door onto the sidewalk. (Id. at 251.)

When they were outside on the sidewalk, Salas had Luevano "by the scruff of the neck," and Luevano felt as if Salas had hit him in the back of the head. (Id. at 251-54.) Petitioner ran again, but Salas soon had him on the ground in the parking lot. (Id. at 254-55.) Luevano was face down with Salas on top of him, and Salas's knee was in his back. (Id. at 255-56.) Luevano testified that he attempted to twist out from underneath Salas's knee, and Salas began hitting the back of his head and pushing his head into the ground. (Id. at 256-58.) Luevano saw a security vehicle pull up and thought the incident was over, but Salas kept pushing him down by the neck so Luevano began resisting more. (Id. at 258.)

Petitioner thought the security guard would handcuff him, but the guard just stood there. (Id. at 259.) Luevano thought Salas "was having a bad day or something because he was going really far for being loss prevention and trying to keep his merchandise from leaving the store." (Id.) Luevano felt pressure on the back of his legs, believed that he was about to be "jumped," and decided it was time to begin defending himself. (Id. at 260-61.) He pulled the X-Acto knife out of his pocket and started cutting Salas. (Id. at 262-63.) He was afraid that he was going to be hurt, and he did not expect to be hurt by a store's loss prevention officer. (Id. at 263, 303.)

The statement Petitioner made to Salas regarding "25 to life" was a reference to his belief that he would likely face a sentence of twenty-five years to life in prison if he were convicted of another petty theft offense. (Id. at 289-90.) Luevano testified that after he had been handcuffed, he still attempted to run because he did not want to be arrested. (Id. at 268-69.) The defense rested. (Id. at 308.)

Frederick James, a parole agent with the department of corrections, was called as a rebuttal witness. (Id. at 319-21.) The agent was on duty at the county jail two days after Luevano's arrest and testified that Luevano asked, "What am I looking at?" (Id. at 321.) He explained that this was a common question from persons arrested while on parole, and the agent asked Luevano about his current offense. (Id. at 321-22.) Petitioner said, "I went to the Wal-Mart and tried to switch the price on a computer monitor and got caught by the security guard. He tried to detain me, so I cut him with a box cutter I had in my pocket." (Id. at 324-25.) The parole agent asked Luevano, "Why did you do that?" (Id. at 324.) He replied, "I did not think the security guard had the right to put his hands on me." (Id.) Petitioner denied making those statements during his trial testimony; Luevano said he had refused to speak to the parole agent about the incident "because he wasn't my parole officer." (Id. at 272.) Both parties rested, and the jury was excused until the next day. (Id. at 328-30.)

The next morning, at the time closing arguments were scheduled to begin, defense counsel informed the court that when he returned to his office the previous afternoon, correspondence from Wal-Mart had arrived in response to a subpoena duces tecum. (Lodgment No.

2, Rep.'s Tr. vol. 4, 369.)  The documents were Wal-Mart policy guidelines describing what employees are allowed to do when detaining shoplifters.  (Id.)  Defense counsel moved to reopen in order to cross-examine Salas with the documents, arguing that Wal-Mart policies provided that their agents are not permitted to pursue a suspected shoplifter who is fleeing more that ten feet, and they must stop pursuing any fleeing shoplifter if it looks like somebody could be hurt.  (Id. at 369-70.)  Counsel argued that Luevano's state and federal constitutional rights to confront and cross-examine Salas were implicated because Salas's credibility was at issue.  (Id. at 370-71.)  He argued that Salas might have knowingly violated Wal-Mart policies, and Luevano's claim of self-defense was implicated because Luevano was defending himself in the face of a violent and overzealous pursuit by Salas.  (Id.)  Furthermore, one of the seated jurors had inquired about Wal-Mart's policies regarding detaining shoplifters.[1]  (Id.)

The trial judge reviewed the Wal-Mart documents, described them on the record, and discussed the issue outside the presence of the jury.  (Id. at 378-84, 396, 410, 417.)  The court denied the motion to reopen.  (Id. at 412.)  It found that the evidence had minimal relevance and was vastly outweighed by prejudice.  The

---

[1] The juror referred to sent a note to the trial judge on the first day of trial, which is included in the record.  (Lodgment No. 1, Clerk's Tr., 00155 (note)).  It reads: "Is it legal for a non-peace officer to use force when detaining a shoplifter?  Is it (Wal-Mart) policy to use force to detain a shoplifter?  If so, what is California law?  Is force necessary?  When is it necessary?"  (Id.)  The trial judge responded that the question would be addressed by counsel during their examination of the witnesses or in the jury instructions or both.  (Id. at 00152 (mins.); Lodgment No. 2, Rep.'s Tr. vol. 2, 117-18.)  The jury instructions addressed state law regarding a merchant's right to use force to detain a suspect, as well as the ability of a private person to effect an arrest for a public offense committed in his or her presence.  (Lodgment No. 2, Rep.'s Tr. vol. 4, 434-35.)

trial evidence showed that there was not a substantial break in contact between Salas and Luevano, and litigating whether the policy was violated would be time-consuming and confusing to the jurors; reopening the case would lengthen the trial and might result in the loss of jurors who had been told at the beginning of trial of its expected length, which had already been exceeded; and the policies related to civil liability of Wal-Mart, not criminal liability of Petitioner.  (<u>Id.</u> at 409-12.)

The jury was instructed, heard closing arguments, and began their deliberations.  (<u>Id.</u> at 418-502.)  Petitioner admitted the truth of the prior conviction allegations.  (<u>Id.</u> at 508-18.)  After deliberating for about an hour, the jury found Luevano guilty on all charges and found the allegations that he had personally used a deadly weapon and personally inflicted great bodily injury on the victim were true.  (<u>Id.</u> at 519-21; Lodgment No. 1, Clerk's Tr. 00161-65 (verdicts); <u>id.</u> at 00160 (mins.).)

**IV.  <u>Petitioner's Claims</u>**

Luevano raises three claims in his Petition.  In claim one, he argues that his trial counsel's failure to obtain the Wal-Mart policies in time to use them at trial amounted to ineffective assistance in violation of his Sixth Amendment rights.  (<u>See</u> Pet. 6; Pet. App. A, 1-6.)  He contends that at the start of trial, counsel was aware that the documents subpoenaed from Wal-Mart had not arrived, yet he did not request a continuance of the trial. (<u>Id.</u>)  Petitioner attaches a copy of the Wal-Mart polices as Exhibit 1 to the Petition and argues they are relevant to his defense.  Luevano characterizes his defense as a credibility contest between Salas and him, because they show that Salas's

actions were overly aggressive by Wal-Mart standards.  (Pet. App. A, 5-6.)

In claim two, Luevano alleges that his rights to confront and cross-examine Salas, and to present evidence, as protected by the Sixth and Fourteenth Amendments, were violated by the trial court's denial of the motion to reopen the defense case.  (Pet. at 7; Pet. App. A, 7-9.)  Petitioner argues that the evidence would have shown that Salas was not simply doing his job, and his willingness to violate Wal-Mart policies demonstrates that he had a propensity for excessive force and violence.  (Pet. App. A, 7-9.)

Petitioner alleges in claim three that his federal constitutional right to the effective assistance of appellate counsel was violated when his counsel failed to present a claim on direct appeal that trial counsel was ineffective because he failed to present evidence of the Wal-Mart policies.  (Pet. at 8.)

**V.    DISCUSSION**

**A.    Scope of Review**

Title 28, United States Code, § 2254(a), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of

-14-

a State court shall not be granted with respect to any claim that was <u>adjudicated on the merits</u> in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West 2006) (emphasis added).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases[]" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." <u>Williams v. Taylor</u>, 529 U.S. 362, 405–06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." <u>Id.</u> at 407. An unreasonable application may also be found "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Id.</u>

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal

-15-

09cv0145

law erroneously or incorrectly. . . .  Rather, that application

must be objectively unreasonable."  Lockyer v. Andrade, 538 U.S.

63, 75-76 (2003) (internal quotation marks and citations omitted).

Clearly established federal law "refers to the holdings, as opposed

to the dicta, of [the United States Supreme] Court's decisions

. . . ."  Williams, 529 U.S. at 412.

    Habeas relief is also available if the state court's

adjudication of a claim "resulted in a decision that was based on

an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."  28 U.S.C.A. § 2254(d)(2)

(West 2006).  In order to satisfy this provision, a federal habeas

petitioner must demonstrate that the factual findings upon which

the state court's adjudication of his claims rest are objectively

unreasonable.  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

**B.   <u>Analysis</u>**

    The resolution of Petitioner's second claim for relief is

dispositive of his other claims.  Accordingly, the Court will begin

the analysis with claim two, the only one of the three claims

denied by the state courts in a reasoned opinion.  (<u>See</u> Lodgment

No. 4, <u>People v. Luevano</u>, No. D50281, slip op. at 1-7.)

        1.   <u>Claim Two:  Denial of Right to Confront and Cross-</u>
             <u>Examine Salas</u>

    In claim two, Luevano alleges that his rights to present

evidence and to confront and cross-examine Salas were violated by

the trial court's denial of the motion to reopen the defense case.

(Pet. at 7; Pet. App. A, 7-9.)  Respondent replies that the state

courts' resolution of this claim was neither contrary to, nor an

///

unreasonable application of, clearly established Supreme Court law. (See Mem. P. & A. Supp. Answer 6-9.)

Luevano raised this claim in the petition for review he filed in the California Supreme Court. (Lodgment No. 5, Pet. for Review, People v. Luevano, No. SD2007800791.)  That court denied the petition without a citation of authority or a statement of reasoning.  (Lodgment No. 6, People v. Luevano, No. S161233, order.)  Luevano had presented this claim to the state appellate court on direct appeal, and the court denied it on the merits in an unpublished opinion.  (See Lodgment No. 3, Appellant's Opening Brief, People v. Luevano, No. D050281; Lodgment No. 4, People v. Luevano, No. D50281, slip op. at 4-6.)

In Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991), the Supreme Court adopted a presumption which gives no effect to unexplained state court orders but "looks through" them to the last reasoned state court decision.  This Court will look through the silent denial by the state supreme court to the appellate court opinion. After finding that the trial court did not abuse its discretion in denying the motion to reopen, the appellate court analyzed Petitioner's federal claim:

> To the extent Luevano has couched his contention in constitutional terms, it is also clear that the Sixth Amendment does not require trial courts to admit any evidence offered by a defendant, nor must it permit every avenue of cross-examination such defendant might wish to pursue.  Trial courts have discretion to exclude evidence, even in the face of a Sixth Amendment argument, where such evidence is repetitive, cumulative, or only marginally relevant. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679; *People v. Jennings* (1991) 53 Cal.3d 334, 372; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 350.)
>
> Applying the appropriate standard of review, it is clear the trial court acted well within its discretion to deny the request to reopen.  As the trial court noted,

the material at issue dealt entirely with Wal-Mart's internal policies regarding store security.  The policies recognized the company policies might be more restrictive than state law.  They are plainly designed to regulate the activities of company employees to prevent injury or potential civil liability.  They do not purport to address the criminal law of any state or federal jurisdiction.  Rather, such policies rationally seek to limit losses that companies might incur due to civil suit or injury to employees.  A retailer might conclude the loss of a few hundred dollars in merchandise is not worth the risk of serious injury to an employee or customer. Such a rational business decision does not affect the question under California law of whether Salas was the aggressor, for purposes of Luevano's claim of self-defense or whether Salas used excessive force, which might have justified Luevano using deadly force to protect himself.

Salas was thoroughly cross-examined and Luevano was able to fully set forth his defense.  Further examination of Salas about internal Wal-Mart policies, which he apparently had never seen, would not add any relevant evidence for the jury's consideration.  The trial court's decision to deny the request to reopen the case was proper and did not deny Luevano his Sixth Amendment right to confrontation.

(Lodgment No. 4, <u>People v. Luevano</u>, No. D50281, slip op. at 5-6.)

"The Sixth Amendment's Confrontation Clause provides that, '(i)n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'  We have held that this bedrock procedural guarantee applies to both federal and state prosecutions."  <u>Crawford v. Washington</u>, 541 U.S. 36, 42 (2004) (citing <u>Pointer v. Texas</u>, 380 U.S. 400, 406 (1965)). "Restrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence 'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" <u>Michigan v. Lucas</u>, 500 U.S. 145, 151 (1987) (quoting <u>Rock v. Arkansas</u>, 483 U.S. 44, 56 (1987)).

The Confrontation Clause "does not require the court to reopen cross-examination so that defense counsel can pursue a line of

questioning that was available when the witness testified initially." Stephens v. Hall, 294 F.3d 210, 227 (1st Cir. 2002). Rather, it only guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (emphasis in original).

In determining whether a state trial court's limitation on cross-examination of a prosecution witness rises to the level of a Confrontation Clause violation, the Supreme Court has observed:

> We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness."

Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986) (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)); see also Pennsylvania v. Ritchie, 480 U.S. 39, 51-52 (1987)("[T]he right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable.")

Luevano contends that his inability to cross-examine Salas with the Wal-Mart polices prevented him from introducing evidence that Salas had a propensity for excessive force and violence. (Pet. App. A, at 8.) He attaches copies of the policies to the Petition and contends they (1) prohibit pursuing a suspected shoplifter more that ten feet, but the trial court found that Salas pursued him thirty feet; (2) provide that a security officer must stop pursuing a suspect immediately if it appears that any person may be harmed, but both he and Salas were injured; (3) provide that

employees may not physically reapprehend a suspect who evades physical restraints, but Luevano broke free several times during the struggle; and (4) prohibit a security officer from striking a suspect, but Luevano contends Salas slammed him into a vending machine, ripped his clothes, struck him in the back of the head several times, smashed his face into the parking lot asphalt, and repeatedly kneed him in the back. (Id.)

Respondent answers that the state appellate court identified the applicable clearly established federal law and correctly found that reasonable limitations on cross-examination are permitted. (Mem. P. & A. Supp. Answer 7-8.) Respondent contends that whether Salas was the aggressor or used excessive force under California law is "wholly distinct" from whether Salas violated Wal-Mart's internal policies and procedures. (Id. at 8.) Accordingly, the policies were not relevant, and their admission would have confused or misled the jury. (Id.) In any case, Respondent contends that the appellate court correctly noted that the record strongly suggests Salas was unaware of the policies and that evidence that Salas violated the polices would have been of marginal relevance. (Id.)

Petitioner replies that it is misleading for Respondent to characterize the appellate court's "dicta," that Salas apparently had never seen the Wal-Mart policies, as a finding that the record "strongly suggests" Salas was unaware of the polices. (Traverse 2.) Petitioner questions how the appellate court could make that finding when Salas was not actually cross-examined with the policies. (Id.) Rather, he contends that cross-examination of Salas with the policies "would go a long way to determining

1  'whether force was applied in a good-faith effort . . . or

2  maliciously and sadistically to cause harm.'"   (<u>Id.</u> at 3 (quoting

3  <u>Hudson v. McMillian</u>, 503 U.S. 1, 6-7 (1992)) (citing <u>Whitley v.</u>

4  <u>Albers</u>, 475 U.S. 312, 320-21 (1986)).)

5      Salas was asked on direct examination about his training,

6  which included his knowledge of Wal-Mart's policies, and answered

7  questions regarding the procedures he actually follows.  (Lodgment

8  No. 2, Rep.'s Tr. vol. 2, 100-03; Lodgment No. 2, Rep.'s Tr. vol.

9  3, 130-31.)  He said he received three weeks of on-the-job

10 training, that he "read a notebook," and that "company policy" was

11 explained to him.  (Lodgment No. 2, Rep.'s Tr. vol. 2, 100-02.)  He

12 also indicated that Wal-Mart policy forbids directly striking a

13 suspect.  (Lodgment No. 2, Rep.'s Tr. vol. 3, 130.)

14     Defense counsel began cross-examination with questions about

15 Salas's training and experience, including Wal-Mart policies.  (<u>Id.</u>

16 at 179-82.)  Salas testified that he was never given any training,

17 either by Wal-Mart or a third-party provider, regarding how he

18 should chase a fleeing suspect.  (<u>Id.</u> at 180-82.)  Rather, the

19 training he received was based on the assumption that the suspected

20 shoplifter is not trying to flee.  (<u>Id.</u> at 180.)  Salas was not

21 asked any questions on cross-examination about the "notebook" he

22 had been given or whether he was independently aware, from reading

23 the notebook or having the policies explained to him, of any Wal-

24 Mart policies regarding fleeing suspects.  Defense counsel was not

25 in possession of the written Wal-Mart policies at that time and was

26 presumably unaware that Wal-Mart policies addressed procedures

27 regarding fleeing suspects.

28 ///

Nevertheless, Salas was cross-examined about Wal-Mart policies which prohibited him from hitting suspects.  The only evidence he violated that policy was Petitioner's testimony that Salas hit him in the back of the head.  Thus, the jury was already called upon to assess whether Salas violated that particular policy.  The Court must address whether additional cross-examination with the policies regarding fleeing suspects might have affected Salas's credibility.

Salas, however, testified that he had not been trained as to Wal-Mart policies regarding fleeing suspects.  Thus, regardless of whether Salas knew of and violated policies regarding fleeing suspects, the appellate court was correct in finding they had very little relevance to "whether Salas acted within California law in using force to restrain Luevano or . . . whether Luevano was entitled to use deadly force in self-defense." (Lodgment No. 4, People v. Luevano, No. D05281, slip op. at 4.)  The jury was instructed that they could find that Luevano's actions were "lawful self-defense if:  [He] reasonably believed that he was in imminent danger of suffering bodily injury; (2) [He] reasonably believed that the immediate use of force was necessary to defend against that danger; [and] (3) The defendant used no more force than was reasonably necessary to defend against that danger." (Lodgment No. 2, Rep.'s Tr. vol. 4, 435.)

Petitioner testified that he did not believe he was in danger of being hurt until he saw the security guard standing next to him without intervening, felt pressure from Rodriguez on the back of his legs, and concluded that Salas "was getting more violent" and would do "whatever it took to make sure that [he] didn't get away." (Lodgment No. 2, Rep.'s Tr. vol. 3, 260-63.)  Luevano's admissions

belied a need to defend himself.  He continued his attempts to
escape even after he had been handcuffed and the struggle had
ended, and Luevano admitted that he was motivated to avoid arrest
because he believed he would likely face a life sentence if
arrested.  (Id. at 268-69, 290.)  Based on his past arrest for
shoplifting, he thought Salas "was really going far . . . trying to
keep his merchandise from leaving the store."  (Id. at 259-60.)
Petitioner "didn't expect to be manhandled" and thought Salas would
probably follow him to his car and record the vehicle's license
plate number.  (Id. at 295.)  Luevano told the parole agent that he
cut Salas because he did not have "the right to put his hands on
me," not because he was afraid of being hurt as he testified to at
trial.  (Id. at 324.)  Salas testified that Luevano apologized
after he had been handcuffed and taken back inside the store.  (Id.
at 168.)

Petitioner has not established that Salas's credibility could
have been diminished in any meaningful way by cross-examination
with the Wal-Mart policies regarding fleeing suspects.  As the
appellate court pointed out, the record was unclear as to whether
Salas was aware of the nature and extent to those policies, which
were geared toward avoidance of civil liability.  The jury was
instructed on the law regarding how far Salas was allowed to go in
apprehending Luevano (Lodgment No. 2, Rep.'s Tr. vol. 4, 434-35),
and internal Wal-Mart policies were of no relevance to the
determination of whether Salas acted within California law.  Even
if Salas was aware of the policies and violated them, the
justification for the amount of force used focuses on the
difference between Petitioner's and Salas's versions of the events.

The testimony of other eyewitnesses and the minor nature of Petitioner's injuries outweigh any impact a violation of the policies might have had on Salas's credibility. Luevano's credibility is undermined by his fear of a life sentence, his three felony convictions, and his admission that he was going to the store to steal.

In sum, Salas was cross-examined about policies forbidding him from hitting suspects and the difference in his and Luevano's testimony. Other witnesses testified as to the nature and extent of the struggle. Even if Salas had been confronted with Wal-Mart policies regarding fleeing suspects, it is unlikely that Salas's credibility could have been significantly diminished with further cross-examination. Van Arsdall, 475 U.S. at 679-80. The state appellate court's similar conclusion, which cited to and relied on the principles articulated in Van Arsdall, was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts.[2] Miller-El, 537 U.S. at 340; Williams, 529 U.S. at 412-13; Van Arsdall, 475 U.S. at 679-80.

Moreover, assuming Petitioner could demonstrate a violation of the Confrontation Clause arising from the trial court's denial of

---

[2] Petitioner's reliance on Hudson and Whitley is misplaced. Whitley articulates factors to use in deciding "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm," so as to determine whether a state actor inflicted punishment in violation of the Eighth Amendment's Cruel and Unusual Punishments Clause upon a prisoner who was shot during the quelling of a prison riot. Whitley, 475 U.S. at 321; see Hudson, 503 U.S. at 7 (considering same Whitley factors under Eighth Amendment excessive force analysis for prisoner beaten by guards). Because Petitioner has not presented (and is unable to state) an Eighth Amendment claim, those cases do not apply. Thus, the adjudication of his claims by the state courts was neither contrary to, nor involved an unreasonable application of, those cases. Williams, 529 U.S. at 412-13.

defense counsel's motion to reopen, or demonstrate that the state courts' contrary conclusion was objectively unreasonable within the meaning of AEDPA, the Court must determine whether the error was harmless. <u>Van Arsdall</u>, 475 U.S. at 680-84 (holding that Confrontation Clause violations are subject to harmless error analysis); <u>see also</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 119 (2007) (holding that harmless error analysis is still required after establishing an unreasonable application of clearly established federal law because 28 U.S.C. § 2254(d) "sets forth a precondition to the grant of habeas relief[,] . . . not an entitlement to it[]").

Habeas relief is not available "unless the error resulted in 'substantial and injurious effect or influence in determining the jury's verdict[,]' or unless the judge 'is in grave doubt' about the harmlessness of the error." <u>Medina v. Hornung</u>, 386 F.3d 872, 877 (9th Cir. 2004) (citations omitted).

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

<u>Van Arsdall</u>, 475 U.S. at 684.

All the factors identified in <u>Van Arsdall</u> support a finding that any error was harmless. First, although Salas's testimony was important to the prosecution's case, it was well corroborated by all the other witnesses, including Petitioner. Luevano's testimony

was substantially the same as all the witnesses who testified, except as to whether Salas hit Petitioner and smashed his face into the asphalt. His claim of the need to defend himself was belied by the minor nature of Luevano's injuries and his desperation to avoid being arrested. Moreno testified that she never saw Salas hit Petitioner, although she was not present at all times during the struggle. (Lodgment No. 2, Rep.'s Tr. vol. 2, 71.)

Petitioner's defense that he had a reasonable belief that use of a deadly weapon was necessary to prevent injury to himself is further undermined by evidence that he did not use his knife until he was completely surrounded, without other options for escaping what he knew would likely be a life sentence. Most importantly, the evidence established that Petitioner suffered only minor injuries, consistent with the type of struggle described by the witnesses, whereas Salas incurred serious injuries which have scarred him for life. Moreover, Salas was cross-examined regarding whether Wal-Mart policies prohibited striking suspected shoplifters. Thus, the cross-examination of Salas with the Wal-Mart policies regarding pursuing fleeing suspects would have had little corroborating or contradicting effect.

The remaining Van Arsdall factors weigh against a finding of harmfulness. Salas was subject to cross-examination on Wal-Mart policies, which revealed that he knew he was permitted to use "pressure points" but not directly strike suspects. In addition, the prosecution's case was extremely strong, supported not only by eyewitnesses, including Petitioner's testimony, but by physical evidence regarding the injuries Petitioner inflicted and received. The Court is convinced that any questioning of Salas's credibility,

arising from his violation of the policies regarding fleeing suspects, would not have had a substantial and injurious effect or influence on the jury's verdicts.  See Medina, 386 F.3d at 877.

For these reasons, the state appellate court's determination that the trial court's denial of the defense motion to reopen the case to confront and cross-examine Salas with the internal Wal-Mart policies did not violate Petitioner's constitutional rights and was neither contrary to, nor an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Miller-El, 537 U.S. at 340; Williams, 529 U.S. at 412-13; Van Arsdall, 475 U.S. at 679-80.  Furthermore, any error arising from that decision was clearly harmless.  Medina, 386 F.3d at 877.  Accordingly, the Court **RECOMMENDS** habeas relief be **DENIED** as to claim two.

> 2.  Claim One:  Ineffective Assistance of Trial Counsel

In claim one, Luevano alleges that his trial counsel rendered ineffective assistance by failing to procure the Wal-Mart policies in time to use them at trial.  (See Pet. 6; Pet. App. A, 1-6.)  He complains that counsel knew that the documents subpoenaed from Wal-Mart had not arrived by the start of trial, yet he did not request a continuance.  (Id.)

Respondent answers that Petitioner has not carried his burden of establishing that he was prejudiced by trial counsel's failure to obtain the policy documents before trial, because he has failed to demonstrate any error arising from the exclusion of the policies.  (Mem. P. & A. Supp. Answer 9-10.)  Respondent contends that the silent denial of this claim by the state supreme court is

neither contrary to, nor an unreasonable application of, clearly established Supreme Court law governing ineffective assistance of counsel claims. (Id.)

Petitioner replies that his ineffective assistance of counsel claim raises a constitutional violation distinct from the trial court's failure to reopen the defense case. (Traverse 1-2.) He contends that although the appellate court found that the Wal-Mart policies were not relevant to any disputed issue, the policy documents would have been admissible if defense counsel had obtained them in time. (Id. at 2.) Luevano disagrees with the appellate court's relevancy determination and argues that the materials could have been used to demonstrate that Salas acted in excess of his training and intended to inflict harm, thus bolstering Luevano's claim of self-defense. (Id.)

Luevano raised this claim in a habeas corpus petition filed in the California Supreme Court. (Lodgment No. 7, Luevano v. Martel, No. S165083 (petition).) The petition was denied without a citation of authority or a statement of reasoning. (Lodgment No. 8, In re Luevano, No. S165083, order.) Because there is no lower state court opinion addressing this claim, the Court is required to conduct an independent review of the record to determine whether the California Supreme Court clearly erred in its application of controlling federal law when it denied the claim. Richter v. Hickman, 578 F.3d 944, 951 (9th Cir. 2009) (en banc); Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir. 2002) ("(W)hile we are not required to defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the

case constituted an unreasonable application of clearly established federal law.")

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668 (1984). See Baylor v. Estelle, 94 F.3d 1321, 1323 (9th Cir. 1996) (stating that Strickland "has long been clearly established federal law determined by the Supreme Court of the United States"). For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must demonstrate two things. First, he must show that counsel's performance was deficient. Strickland, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, he must show counsel's deficient performance prejudiced the defense. Id. This requires showing that counsel's errors were so serious they deprived Petitioner "of a fair trial, a trial whose result is reliable." Id.

To satisfy the prejudice prong, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. Williams, 529 U.S. at 406; Strickland, 466 U.S. at 694 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.") The prejudice inquiry is to be considered in light of the strength of the prosecution's case. Luna v. Cambra, 306 F.3d 954, 966 (9th Cir.), amended, 311 F.3d 928 (9th Cir. 2002).

Because Petitioner is unable to demonstrate prejudice arising from defense counsel's performance, there is no need to determine whether counsel was deficient in failing to obtain the Wal-Mart policy documents prior to trial. See Strickland, 466 U.S. at 690, 694 (holding that both deficient performance and prejudice must be shown to prevail on an ineffective assistance claim). In order to demonstrate prejudice, Luevano must show a reasonable probability that confidence in the outcome of his trial is undermined by defense counsel's failure to confront and cross-examine Salas with the Wal-Mart policy documents. See e.g., Wiggins v. Smith, 539 U.S. 510, 534 (2003) ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence [which counsel failed to discover and present at sentencing].") Petitioner argues that he was prejudiced because the evidence would have shown that Salas was not simply doing his job; he exceeded Wal-Mart policies and had a propensity for excessive force and violence. (Pet. App. A, 7-9.)

As discussed above, Luevano's contention that it was reasonable to use deadly force to repel Salas's effort to handcuff him is belied by the disparity in their injuries, as well as Petitioner's admission that he tried to avoid arrest because he was likely facing life in prison. His self-defense case was further weakened by his statement to the parole agent that he cut Salas because he did not believe Salas had a right to put his hands on him. In addition, he testified that his past shoplifting experience had taught him that loss prevention officers do not ordinarily pursue a fleeing suspect, giving rise to an inference that Luevano believed he could eventually escape if he refused to

submit and used force to resist arrest.  Petitioner's assertion
that he resorted to deadly force due to a reasonable belief that it
was necessary to prevent further injury to himself was contradicted
by the evidence.  He resorted to brute force only after he was
completely surrounded and about to be handcuffed.  At that point,
it was clear that Luevano was not going to escape without using
deadly force, and he was desperate to avoid spending the rest of
his life in prison.  Thus, evidence that his use of the knife was a
reasonable response to a reasonably-held belief in the need to
defend himself was extremely weak, whereas the evidence supporting
a finding of guilt was extremely strong.

In light of the strength of the prosecution's case,
confronting Salas with the Wal-Mart policies regarding fleeing
suspects would not have strengthened Petitioner's defense.  The
claim of self-defense was weak; the jury rejected it after only an
hour of deliberations.  In any case, Salas was cross-examined
regarding the policy against hitting suspects.  The jury evaluated
Luevano's and Salas's credibility.  Petitioner's attempt to
demonstrate prejudice arising from defense counsel's error is
untenable.

Based on an independent review of the record, the Court finds
that the state supreme court's silent denial of claim one was
neither contrary to, nor an unreasonable application of, clearly
established Supreme Court law.  <u>Williams</u>, 529 U.S. at 412-13;
<u>Greene</u>, 288 F.3d at 1089.  Accordingly, the Court **RECOMMENDS**
habeas relief be **DENIED** as to claim one.

///

///

1              3.   Claim Three:  Ineffective Assistance of Appellate
2                   Counsel

3         Petitioner alleges in claim three that his federal
4    constitutional right to the effective assistance of appellate
5    counsel was violated because counsel failed to argue on appeal that
6    Luevano received ineffective assistance of trial counsel based on
7    the failure to confront and cross-examine Salas with the written
8    Wal-Mart policies.  (Pet. at 8.)  Respondent replies that
9    Petitioner is unable to demonstrate that he was prejudiced by
10   appellate counsel's failure to raise the issue on appeal because
11   Luevano was unable to show prejudice from trial counsel's failure
12   to timely obtain the policy documents.  (Mem. P. & A. Supp. Answer
13   9-10.)  As a result, the resolution of this claim by the state
14   supreme court was neither contrary to, nor an unreasonable
15   application of, clearly established Supreme Court law.  (Id.)

16        Luevano raised this claim in his habeas corpus petition filed
17   with the California Supreme Court.  (Lodgment No. 7, Luevano v.
18   Martel, No. S165083 (petition).)  Because the petition was denied
19   without a citation of authority or a statement of reasoning,
20   (Lodgment No. 8, In re Luevano, No. S165083, order), and there is
21   no lower state court opinion addressing this claim, the Court again
22   conducts an independent review of the record to determine whether
23   the state court clearly erred in its application of controlling
24   federal law when it denied Luevano's petition.  Richter, 578 F.3d
25   at 952; Pirtle, 313 F.3d at 1167; Greene, 288 F.3d at 1089.

26        Strickland also sets forth the clearly established United
27   States Supreme Court law governing ineffective assistance of
28   appellate counsel claims.  Smith v. Robbins, 528 U.S. 259, 285

-32-

09cv0145

(2000). As discussed above, Petitioner's constitutional rights were not violated by defense counsel's failure to confront and cross-examine Salas with the Wal-Mart policies. Because Luevano is unable to demonstrate prejudice arising from trial counsel's performance, he failed to establish ineffective assistance of trial counsel. Consequently, Petitioner is not entitled to habeas relief as to claim three. The failure to raise meritless or untenable claims on appeal does not constitute ineffective assistance of appellate counsel. <u>Featherstone v. Estelle</u>, 948 F.2d 1497, 1507 (9th Cir. 1991) ("[T]rial counsel's performance, although not error-free, did not fall below the <u>Strickland</u> standard. Thus, petitioner was not prejudiced by appellate counsel's decision not to raise issues that had no merit."); <u>Gustave v. United States</u>, 627 F.2d 901, 906 (9th Cir. 1980) ("There is no requirement that an attorney appeal issues that are clearly untenable."); <u>Baumann v. United States</u>, 692 F.2d 565, 572 (9th Cir. 1982) (stating that attorney's failure to raise meritless legal argument does not constitute ineffective assistance).

Based on an independent review of the record, the Court finds that the state supreme court's silent denial of claim three was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. <u>Williams</u>, 529 U.S. at 412-13; <u>Richter</u>, 578 F.3d at 952. Accordingly, the Court **RECOMMENDS** habeas relief be **DENIED** as to claim three.

**V.     CONCLUSION AND RECOMMENDATION**

The Court submits this Report and Recommendation denying all three claims in the Petition to United States District Judge William Q. Hayes under 28 U.S.C. § 636(b)(1) and Local Civil Rule

HC.2 of the United States District Court for the Southern District of California.  For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the district court issue an Order (1) approving and adopting this Report and Recommendation and (2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than <u>**June 18, 2010**</u>, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than <u>**July 2, 2010**</u>.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156 (9th Cir. 1991).

**DATED:** May 14, 2010

Hon. Ruben B. Brooks
**UNITED STATES MAGISTRATE JUDGE**